IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


STARLITE AVIATION OPERATIONS
LTD., an Irish corporation,

                    Plaintiff,

      v.

ERICKSON INCORPORATED, an Oregon
Corporation; and ERICKSON HELICOPTERS,
INC. f/k/a EVERGREEN HELICOPTERS, INC.,
an Oregon corporation,

                  Defendants.

No. 3:15-cv-00497-HZ

OPINION & ORDER

James H. Neale
Sarah O'Connell
NORTON ROSE FULLBRIGHT US, LLP
666 Fifth Avenue, 31st Floor
New York, NY 10103

Timothy S. DeJong
Robert Shlachter
STOLL STOLL BERNE LOKTING & SHLACHTER, PC
209 SW Oak Street, Suite 500
Portland, OR 97204

      Attorneys for Plaintiff

1 – OPINION & ORDER

Joel A. Parker
SCHWABE WILLIAMSON & WYATT, PC
1211 SW Fifth Avenue, Suite 1800
Portland, OR 97204

Daniel A. Broderick
Steven J. Roman
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC 20006

      Attorneys for Defendants

HERNÁNDEZ, District Judge:

      Plaintiff Starlite Aviation Operations Ltd. ("Plaintiff") brings this action against

Defendants Erickson Incorporated ("Erickson") and Erickson Helicopters, Inc. ("EHI"),

(collectively, "Defendants"). On July 18, 2011, Plaintiff and Defendants' predecessor, Evergreen

Helicopters, Inc. ("Evergreen"), entered into a contract, the Aircraft Services Agreement

("Agreement"). Plaintiff contends that on April 7, 2015, Defendants[1] terminated the Agreement

without valid justification.

      Now before the Court is Plaintiff's Motion for Preliminary Injunction. Plaintiff asks this

Court to enjoin Defendants from terminating the Agreement and restrain them from further steps

to implement such termination. The Court heard oral argument on April 30, 2015, and issued an

Order from the bench, indicating that this Opinion & Order would follow. The Court granted the

Motion for Preliminary Injunction for the reasons below.

## BACKGROUND

      Plaintiff is an aviation company which offers a range of helicopter services worldwide,

including "passenger and cargo transport, aircraft maintenance, helicopter sales and charter, pilot

---

[1] Both parties use "Defendants," "Evergreen," "EHI," and "Erickson," interchangeably throughout their
filings. The Court tries to use the same name the parties used for each particular allegation or fact.

training and aircraft management." Compl. ¶ 2. EHI is engaged in the business of "operating and

maintaining aircraft and conducting aircraft charter operations." Id. at ¶ 3. Erickson is

a "leading global provider of aviation services" to a mix of commercial and government

customers. Id. at ¶ 4. EHI is a wholly-owned subsidiary of Erickson, which was formerly known

as Evergreen. Id.

      In 2011, Fluor Intercontinental, Inc., a prime contractor for the United States Department

of Defense, awarded Evergreen a contract in support of Fluor's performance of a contract with

the U.S. Army. Wahlberg Decl. ¶ 4.  Under the contract with Fluor, Evergreen was required to

provide eight aircraft to supply helicopter airlift services in Afghanistan. Id. at ¶ 5. Evergreen

had four aircraft; therefore, Evergreen contracted with Plaintiff to provide the additional four

aircraft. Id. at ¶¶ 7, 9. The Agreement between Defendants and Plaintiff is "essentially a sub-

subcontract." Id. at ¶ 7. Plaintiff provides EHI with aircraft, spare parts, maintenance, and other

services in support of EHI's contract with Fluor. Id; Pl.'s Ex. 1[2].

      The Agreement between Evergreen and Plaintiff states that Plaintiff "shall provide a

'Flight Manager' onboard the Aircraft for each flight." Pl.'s Ex. 1 at ¶ 4(d). Plaintiff was to

provide flight managers for all aircraft—both Plaintiff's and Defendants'. However, because

Plaintiff is a foreign company without the certifications needed to perform the work directly, the

Agreement was structured so that Defendants would hire Plaintiff's pilots and flight managers as

contract employees for the period when they were actually in Afghanistan and ready to fly. Id. at

¶ 11. Plaintiff was responsible for the payroll and travel expenses for flight managers of

Plaintiff's aircraft. Pl.'s Ex. 1 at ¶ 4(d). In addition, the Agreement states that Plaintiff would

---

[2] The exhibit numbers refer to the exhibits the parties provided for oral argument.

schedule the travel for Defendants' flight managers and Defendants would reimburse Plaintiff for such costs. Id.

From the beginning of the Agreement, in July 2011, until the summer of 2014, the parties performed under the Agreement with regard to flight managers in the following way: Plaintiff[3] would provide flight manager candidates to EHI for its approval. Ford Decl. ¶ 8. EHI had to approve of the candidates because EHI hired the candidates as contract employees. Id. After EHI approved a candidate, Plaintiff would coordinate with EHI to arrange any required documentation or training. Id. Then, EHI would process a letter of authorization (LOA) from Fluor, permitting the individual to serve in Afghanistan. Id. Once the LOA was approved, Plaintiff arranged the candidates' travel into Afghanistan. Id. The process generally took between eight and twelve weeks from submitting the application to obtaining the LOA. Id. at ¶ 9. EHI did not allow Plaintiff to have back-up personnel in place; therefore, even if Plaintiff was aware that a flight manager was resigning, Plaintiff could not process a replacement candidate until after the resignation. Id. at ¶ 10.

Beginning in the summer of 2014, the course of performance between the parties under the Agreement began to change. In June 2014, after a flight manager resigned, Plaintiff provided EHI with application documents for a replacement candidate. Id. at ¶ 15. In response, Derek Watt from EHI responded, "Erickson will be filling this position internally due to a shuffling of personnel throughout all of our contracts." Pl.'s Ex. 5. In addition, Erickson Director of Operations Ron Black informed Plaintiff's Crew HR Manager Tarryn Ford that EHI was working on obtaining flight managers without Plaintiff's input. Ford. Decl. ¶ 23.

---

[3] One of Plaintiff's affiliates, Aviation Crew Resource South Africa, actually did this work. Ford Decl. ¶ 1.

4 – OPINION & ORDER

In or around late September 2014, one of the flight managers requested leave to attend to certain family issues. Ford Decl. ¶ 23. In an October 13, 2014 email, Ms. Ford emailed Mr. Black and notified him that this leave would require "a serious juggle on the roster to keep the [flight manager] manpower levels up." Pl.'s Ex. 10 at 1. Mr. Black's responded, "I have one new hire that will be starting in processing today and will be making offers to one or two more this week." Id. Plaintiff provides other emails that demonstrate that EHI increasingly assumed responsibility from Plaintiff for recruiting and processing flight manager candidates. See, e.g., Pl.'s Exs. 13, 16, 17, 32, 33.

On March 20, 2015, Erickson issued Plaintiff a notice of termination of the Agreement (the "March 20 Notice"). Pl.'s Ex. 2. Erickson stated that Plaintiff had failed to perform under the Agreement multiple times. Compl. at ¶ 8; Pl.'s Ex. 2. Specifically, the March 20 Notice stated that Plaintiff had been unable "to consistently meet its obligation to provide the required number of Flight Managers per aircraft as required by Section 4(d) of the Agreement" during specified time periods between January 12 and March 20, 2015. Id.

On March 23, 2015, Plaintiff wrote Erickson, objecting to the termination and demanding that Defendants withdraw the March 20 Notice. Compl. ¶ 13. On March 26, 2015, Plaintiff filed a complaint with this Court. That day, the parties conferred and agreed in writing that EHI would withdraw the March 20 Notice in order for the parties to discuss settlement and to give Plaintiff an opportunity to cure the alleged breaches. However, the parties did not reach a settlement. On April 7, 2015, EHI sent Plaintiff another letter terminating the Agreement (the "April 7 Notice"). Pl.'s Mot. Ex. 33.

Defendants intend to "self-perform" the remainder of the Agreement. Compl. ¶ 12. Defendants have shipped helicopters and other equipment to the area of operations to replace the

helicopters and equipment used by Plaintiff to perform the Agreement. Id. at ¶ 14. Defendants have solicited Plaintiff's employees to work for Defendants and have called meetings to implement the demobilization of Plaintiff's aircraft and personnel. Id.

Additional facts are incorporated into the discussion below.

## STANDARDS

A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The plaintiff "must establish that irreparable harm is *likely,* not just possible[.]" Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011) (emphasis in original). The court may apply a sliding scale test, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." Id.

Nevertheless, the party requesting a preliminary injunction must carry its burden of persuasion by a "'clear showing'" of the four required elements set forth above. Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam); Lopez v. Brewer, 680 F.3d 1068, 1072 (9th Cir. 2012) (a "'preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion'") (quoting Mazurek, 520 U.S. at 972) (emphasis in original).

## DISCUSSION

The Court grants Plaintiff's Motion for Preliminary Injunction because Plaintiff establishes a likelihood of success on the merits and a likelihood of irreparable harm in the

absence of preliminary relief. In addition, the Court finds that the balance of the equities and the public interest tips in Plaintiff's favor.

## I.    The Claims in the Complaint

Plaintiff brings two claims against Defendants. First, Plaintiff seeks a declaratory judgment under 28 U.S.C. § 2201(a) that: (a) Plaintiff has not breached the Agreement in any of the ways described in the Notice; (b) the Notice is ineffective to terminate the Agreement; (c) the Agreement remains in full force and effect; and (d) Plaintiff has the right to continue performing it, without interference from Defendants. Compl. ¶ 17. Second, Plaintiff requests that this Court preliminarily and permanently enjoin Defendants from terminating the Agreement and prohibit Defendants from taking further steps to implement the termination or otherwise interfere with Plaintiff's performance. Id. at ¶ 21.

## II.    Likelihood of Success on the Merits

Plaintiff argues that Defendants lacked valid justification to terminate the Agreement because Plaintiff did not breach the Agreement or, alternatively, any breach by Plaintiff was caused by Defendants' bad-faith conduct.

The parties dispute whether Plaintiff breached the Agreement, thereby providing Defendant with a valid justification to terminate the Agreement under Section 13(a)(i). See Pl.'s Ex. 1 at ¶ 13(a)(i) (stating that either party can terminate the Agreement "following the other Party's failure to perform any of the terms and conditions of this Agreement"). Defendants' April 7, 2015 termination letter states that there were "numerous instances of a failure of performance by Starlite under the terms and conditions of the Agreement." Pl.'s Ex. 33 at 1. While the letter does not specify the kinds of "instances of failure," the March 20, 2015 termination letter explains that Defendants are specifically concerned with Starlite's alleged

inability to provide the required number of flight managers[4] per aircraft, as required by Section 4(d) of the Agreement. Pl.'s Ex. 2 at 1.

Whether or not Plaintiff breached Section 4(d) of the Agreement first depends on whether the contract language at issue is ambiguous. JA Apparel Corp. v. Abboud, 568 F.3d 390, 396-97 (2d Cir. 2009) (under New York law[5], the question of whether a written contract is ambiguous is a question of law for the court); see also Seiden Associates, Inc. v. ANC Holdings, Inc., 959 F.2d 425, 429 (2d Cir. 1992). "Ambiguity is determined by looking within the four corners of the document, not to outside sources...." Id. (citation omitted). If the contract is unambiguous, its meaning is a question of law for the court to decide. See, e.g., Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 66 (2d Cir. 2000). However, where the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered. See, e.g., Seiden, 959 F.2d at 426, 429; In re Consolidated Mutual Insurance Co., 77 N.Y.2d 144, 150, 565 N.Y.S.2d 434, 436, 566 N.E.2d 633 (1990). Where there is such extrinsic evidence, the meaning of the ambiguous contract is a question of fact for the factfinder. JA Apparel, 568 F.3d at 396-97 (citations omitted).

This Court finds that the Agreement is ambiguous as to the meaning of the word "provide" in Section 4(d).

Section 4(d) of the Agreement states:

4. Aircraft Services. Plaintiff shall provide services to Evergreen with respect to the supply of the Aircraft and spare parts, maintenance personnel and actual maintenance of the Aircraft under the supervision and control of Evergreen's designated signatories, as follows:

---

[4] To the extent that Defendants also had a problem with the number of pilots provided by Plaintiff, the issue was not discussed in either termination notice. Therefore, the Court focuses its analysis on the flight manager issue.

[5] The Agreement contains a choice-of-law provision stating that the Agreement shall be "governed by and construed in accordance with the laws of the State of New York." Pl.'s Ex. 1 at ¶ 15(g).

* * *

**(d) Plaintiff shall provide a "Flight Manager" onboard the Aircraft for each flight** (for clarification, the Flight Manager is not a pilot). Each Flight Manager will be a contract employee of Evergreen, but with Plaintiff paying for the Plaintiff Flight Managers' payroll and travel expenses. Plaintiff will also schedule the travel for Evergreen's Flight Managers and Evergreen shall reimburse Plaintiff for such costs. The Flight Manager shall be responsible for making sure all passengers and cargo arrive and depart at the pre-determined manifested locations. The Flight Manager must speak fluent English, and be capable of communicating directives related to mission objectives and Aircraft safety to personnel.

Pl.'s Ex. 1 at 2-3 (emphasis added).

When read as a whole, there are two different reasonable interpretations of the parties' intent with regard to the phrase "provide a Flight Manager." The first reasonable interpretation is that Plaintiff was required only to ensure that a flight manager was available every time there was a flight. The Agreement requires Plaintiff to provide a flight manager for "each flight," not for "every possible flight" or "for each aircraft available to fly." Furthermore, the stated purpose of having flight managers—to make sure passengers and cargo arrive and depart at the pre-determined manifested locations—suggests the importance of a flight manager is to be onboard each flight that takes off, not merely to be available in numbers proportional to each aircraft.

On the other hand, Section 4(d) can also be read to require Plaintiff to ensure that there were as many flight managers as aircraft available at all times, in order to be onboard the aircraft if necessary. Because each flight could not occur without a flight manager, it is reasonable to assume that Defendant expected Plaintiff to "provide" a number of flight managers proportional to the number of aircraft.

When a contract term is ambiguous, the parties are entitled to submit extrinsic evidence as to the intent with which they entered into the Agreement. JA Apparel, 568 F.3d at 399. However, at this stage of the proceeding, it is not necessary to resolve the ambiguity in the

contract language because even if Defendants are correct, Plaintiff nevertheless demonstrates a likelihood of success on the merits of this case.

Defendants relinquished any right to terminate the Agreement based on Section 4(d) because they accepted Plaintiff's continued performance following earlier purported breaches and because any breach of Section 4(d) was caused by Defendants' bad-faith conduct. The March 20 and April 7 Notices state that termination is based upon Plaintiff's failure to provide adequate numbers of flight managers during specified times in January, February, and March 2015. Pl.'s Exs. 2, 33. However, during that time, EHI elected to keep the contract in place rather than terminate it. Therefore, EHI was foreclosed from terminating based on Plaintiff's alleged nonperformance.

The doctrine of "election of remedies" provides as follows:

> When a party materially breaches a contract, the non-breaching party must choose between two remedies—[it] can elect to terminate the contract and recover liquidated damages or [it] can continue the contract and recover damages solely for the breach. A party can indicate that [it] has chosen to continue the contract by continuing to perform under the contract or by accepting the performance of the breaching party. Once a party elects to continue the contract, [it] can never thereafter elect to terminate the contract based on that breach, although [it] retains the option of terminating the contract based on other, subsequent breaches.

ESPN, Inc. v. Office of Comm'r of Baseball, 76 F. Supp. 2d 383, 387-88 (S.D.N.Y. 1999) (quoting Bigda v. Fischbach Corp., 898 F. Supp. 1004, 1011–12 (S.D.N.Y. 1995) (citations omitted). See also Apex Pool Equip. Corp. v. Lee, 419 F.2d 556, 561–63 (2d Cir. 1969) (Under New York law, "'[w]here a contract is broken in the course of performance, the injured party has a choice ... of continuing the contract or of refusing to go on'.... If the injured party chooses to go on [it] loses [its] right to terminate the contract because of the default.") (quoting Emigrant Indus. Sav. Bank v. Willow Builders, 290 N.Y. 133, 145, 48 N.E.2d 293 (1943)); and Inter–Power of New York, Inc. v. Niagara Mohawk Power Corp., 259 A.D.2d 932, 686 N.Y.S.2d 911,

913 (3d Dep't 1999) (Although a party can either "treat the entire contract as broken and sue immediately for the breach or reject the proposed breach and continue to treat the contract as valid", the party must "make an election and cannot 'at the same time treat the contract as broken and subsisting. One course of action excludes the other.'"). The doctrine is available even where there is a "Waiver Provision," such as in § 15(e) of the Agreement. See ESPN, 76 F. Supp. 2d at 388 (explaining that "waiver and election are distinct principles that do not overlap but rather control different phases of the contractual relationship"). Id. at 390.

Furthermore, because EHI repeatedly accepted performance by Plaintiff that it now deems deficient, EHI was obligated to give Plaintiff a reasonable time to conform to its newly announced expectations. Plaintiff submits Ms. Ford's declaration to show that the time Defendants provided to cure was far short of the time required for new flight manager candidates to be hired, processed, and deployed to Afghanistan. Ford Decl. ¶¶ 9, 11, 32-33.

Finally, Plaintiff has demonstrated that Defendants' attempt to terminate the Agreement based on Plaintiff's alleged breach would constitute a breach of the duty of good faith and fair dealing by Defendants.

New York law provides that "implicit in every contract is a promise of good faith and fair dealing, which is breached when a party acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under the agreement." DCMR v. Trident Precision Mfg., 317 F. Supp. 2d 220, 226 (W.D.N.Y.) aff'd sub nom. DCMR v. Trident Precision Mfg. Inc., 110 F. App'x. 205 (2d Cir. 2004) (quoting Skillgames, LLC v. Brody, 1 A.D.3d 247, 767 N.Y.S.2d 418, 422 (1st Dep't. 2003)). The Second Circuit has stated:

> Under New York law, every contact contains an implied covenant of good faith and fair dealing.... This covenant includes "an implied undertaking on the part of each party that

he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part. (citing and quoting Grad v. Roberts, 14 N.Y.2d 70, 75 (1964) (other citations omitted)).

Carvel Corp. v. Diversified Management Group, 930 F.2d 228 (2d Cir. 1991). In other words, the breach of the implied duty of good faith is "merely a breach of the underlying contract." Hallmark Aviation Ltd. v. AWAS Aviation Servs., Inc., No. 12 CIV. 7688 JFK, 2013 WL 1809721, at *4 (S.D.N.Y. Apr. 30, 2013) (citation omitted). "New York law does not treat a breach of the covenant of good faith and fair dealing claim as one that is *separate* from a breach of contract claim where the claims are based on the same facts." Giller v. Oracle USA, Inc., No. 12–895, 2013 WL 646153, at *2 (2d Cir. Feb. 22, 2013).

In H/R Stone, Inc. v. Phoenix Bus. Sys., Inc., the plaintiff, a software purchaser, brought a claim against the defendant, a software programmer, for breach of contract. 660 F. Supp. 351 (S.D.N.Y.1987). The defendant counterclaimed that the plaintiff had breached the implied covenant of good faith and fair dealing by unjustifiably refusing to provide the defendant with information necessary for the defendant to complete the contracted-for programming. Id. While the parties' contract did not specifically call for the plaintiff to supply the needed information, the court found that requirement implicit, and the plaintiff guilty of breaching the duty of good faith and fair dealing. Id. at 358-59 ("Every contract implies that neither party will do anything to prevent performance by the other party[.]"). It is important to note, however, that the plaintiff's breach of the duty of good faith and fair dealing did not relieve the defendant of all obligations under the contract. Id. The defendant was only relieved of performing the contractual duty that was dependent on the information plaintiff was supposed to provide. Id. at 359.

As applied to the present case, if a fact-finder determined that Defendants breached the duty of good faith and fair dealing by impeding Plaintiff's ability to provide the requisite number

of flight managers under the Agreement, then Plaintiff could be relieved of performing that contractual obligation. Defendants would be precluded from terminating the Agreement based on Plaintiff's non-performance.

Plaintiff submits evidence to demonstrate that Defendants intentionally thwarted Plaintiff's efforts to maintain a full roster of flight managers and then seized upon a purported shortage of flight managers to manufacture a reason to terminate the Agreement. According to Plaintiff, Defendant's goals were "to divert to its own coffers the approximately $2.5 million per month that EHI was paying to Plaintiff under the Agreement and to cripple Plaintiff's ability to compete for government-related aviation contracts in the future." Pl.'s Memo. 20. Plaintiff submits Ms. Ford's declaration and accompanying emails, as discussed above, to show that EHI intentionally slowed down the hiring process for flight managers and controlled the process for maintaining the flight manager roster numbers. Ford Decl. ¶ 12, 14-31.

Plaintiff also submits the declaration of Starlite Chief Operating Officer Alan O'Neill, who states that prior to EHI's termination notice, Mr. O'Neill was never told about any issues with flight managers or other breaches of the Agreement. O'Neill Decl. ¶ 4. Mr. O'Neill states that he was a regular participant on weekly conference calls between Plaintiff and EHI beginning in March 2014 to discuss performance concerns under the Agreement. Id. at ¶ 8. Mr. O'Neill states that there was never any discussion on these calls about the provision of flight managers. Id. at ¶ 22. Mr. O'Neill states that, beginning in January 2015 and continuing through March 2015, EHI representatives cancelled or avoided the weekly calls. Id. at ¶¶ 13-20.

Plaintiff also submits the declaration of Starlite Director Slade Thomas. Mr. Thomas states that EHI sent him the March 20 Notice of Termination without any prior indication that Plaintiff had been in breach of the Agreement. Thomas Decl. ¶ 3. Mr. Thomas states that the

termination notice follows an increase in EHI's publicly reported losses and a new EHI CEO who has committed to a strategy of "better leverage[ing] existing aircraft." Id. at ¶ 4; Pl.'s Mot. Ex. 42. Mr. Thomas also states that EHI obstructed Plaintiff's efforts to cure the purported breaches identified in the March 20 Notice. Thomas Decl. ¶ 101-105. EHI "refused to allow a reasonable time for Flight Manager candidates Plaintiff had submitted to be hired (by EHI), processed, and deployed." Id.; see also Suppl. Ford Decl. ¶ 11.

Defendants repeatedly asserted at oral argument that Plaintiff was given notice as to the alleged breach and that Defendants were left with no choice but to terminate the Agreement due to Plaintiff's non-performance. However, Defendants submit very little evidence to support this assertion. Defendants submit an email exchange between EHI employee Rich Staugler and Starlite Chief Financial Officer Alan Foley from November 2014 which demonstrates that Plaintiff was notified that Erickson was not satisfied with the number of pilots Plaintiff was providing. Defs.' Ex. 1. However, this email says nothing about flight managers. In sum, Plaintiff meets its burden of showing that Defendants breached their duty of good faith and fair dealing in attempting to terminate the Agreement.

Taken together, all of the evidence submitted by Plaintiff establishes a likelihood of success on the merits.

**III.    Irreparable Harm**

Ordinarily, monetary harm does not constitute irreparable harm. E.g., Goldie's Bookstore, Inc. v. Superior Court, 739 F.2d 466, 471 (9th Cir. 1984) ("Mere financial injury ... will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation."); L.A. Mem'l Coliseum Comm'n v. Nat'l Football League, 634 F.2d 1197, 1202 (9th Cir. 1980) ("[M]onetary injury is not normally considered irreparable.").

Intangible injuries such as loss of goodwill and prospective customers can qualify as irreparable harm. Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991) (explaining damage to reputation or customer relationships may support a finding of irreparable harm because it is difficult to quantify). The threatened destruction of a business may be sufficient to satisfy the requirement that a movant show a "likelihood of irreparable injury." See Dollar Rent A Car, 774 F.2d at 1375; see also Hughes Network Systems, Inc. v. InterDigital Communications Corp., 17 F.3d 691, 694 (4th Cir. 1994) (in remanding for further consideration, court noted that even if loss can be compensated by money damages, extraordinary circumstances may give rise to irreparable harm required for preliminary injunction); but see Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801–802 (3d Cir. 1989) (harm was not deemed irreparable even though nature of action involved loss of majority of business revenue).

Loss derived from "a lost opportunity to compete on a level playing field for a contract has been found sufficient to prove irreparable harm." Serco Inc. v. United States, 81 Fed. Cl. 463, 502 (2008) (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 826, 828 (2002); United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998) ("[T]he opportunity to compete for a contract and secure any resulting profit has been recognized to constitute significant harm.").

However, an intangible injury must still be likely; speculative injury is insufficient. Earth Island Inst. v. U.S. Forest Serv., 351 F.3d 1291, 1311 (9th Cir. 2003) ("The law does not require the identified injury to be certain to occur, but it is not enough to identify a purported injury

which is only theoretical or speculative."); Goldie's Bookstore, Inc., 739 F.2d at 472 (loss of goodwill and "untold" customers was speculative and did not constitute irreparable injury).

In this case, Plaintiff contends that, in the absence of preliminary relief, it will suffer irreparable harm to its reputation and ability to win bids for future contracts. According to Starlite Director Slade Thomas, Plaintiff's business "requires an unblemished record of reliability and integrity." Thomas Decl. ¶ 108. Plaintiff would be required to disclose a termination of the Agreement in future contract bids, which would devastate Plaintiff's ability to win contracts. Id. at ¶ 110-111; Supp. Thomas Decl. ¶ 3. Mr. Thomas states that "if this termination is not enjoined, it would amount to a virtual death sentence for Plaintiff." Thomas Decl. ¶ 108.

Defendants contend that Plaintiff's reputation and ability to win future contracts will not be irreparably harmed because Plaintiff will not have to disclose the termination, because of Plaintiff's status as a subcontractor (rather than a prime contractor). According to Defendants, only a prime contractor is obligated on Department of Defense contract bids to disclose any past terminations for default, and only when terminated for default by a federal agency and not by a first tier subcontractor. Defs.' Opp. 7 (citing FAR 52-209-5(a)(1)(i)(D)(ii)). Furthermore, to the extent that Plaintiff will have to disclose the termination in future bids, Plaintiff would be able to explain the circumstances of the termination and the termination alone would not impede Plaintiff's ability to win contracts.

However, Plaintiff submits evidence to counter both of Defendants' arguments. Plaintiff shows that it has several bids pending that will require it to disclose its past performance. Supp. Thomas Decl. ¶ 2; Pl.'s Ex. 52. The disclosure could affect Plaintiff's ability to be awarded a contract as a subcontractor for a prime contractor. Supp. Thomas Decl. ¶ 2. The disclosure could

16 – OPINION & ORDER

also affect the prime contractor's ability to receive a contract from the federal government. Id. Furthermore, Plaintiff has submitted bids on its own for contracts other than with the federal government. Id. ¶ 3. In connection with those bids, Plaintiff will have to disclose its past performance, including its performance under the Agreement. Id. Finally, Plaintiff is currently preparing bids for several contracts with both the U.S. government as well as commercial, NGO, and European Union clients. Id. Plaintiff submitted a chart summarizing those bids which demonstrates that the bids are all due within the next one to three months. Id.; Pl.'s Ex. 52.

Plaintiff provides the declaration of expert witness Sharon Larkin. Ms. Larkin also testified at oral argument. Ms. Larkin has seventeen years of experience in the field of government contracts, including twelve years of work with the Government Accountability Office (GAO). Larkin Report at 3. Ms. Larkin also served for nine years as a Judge on the GAO Contract Appeals Board. Id. Ms. Larkin testified that a termination for default would irreparably harm Plaintiff's viability as a government contractor and its ability to be competitive in the public sector, including as a subcontractor. Id. at 2-3. "A company's past performance record on relevant prior efforts—including subcontracts—is a vital consideration in the award of almost every government contract." Id. at 6. "A termination for default is considered the worst possible offense in a company's past performance history." Id.

Defendants submit the declaration and testimony of Michael Killham, who has extensive experience teaching and practicing U.S. federal procurement and fiscal law, including approximately eighteen years working for several different U.S. government and commercial contractors engaged primarily in U.S. Government, commercial, and foreign contracting. Killham Decl. ¶ 3. Mr. Killham asserts that a termination would not result in irreparable harm to Plaintiff because Plaintiff would not be required to disclose the termination to the U.S.

Government in connection with any pending or future U.S. Government solicitations. Id. at ¶ 2. According to Mr. Killham, the federal government is not required and generally does not review a subcontractor's past performance before awarding U.S. Government contracts. Id. at ¶ 2(b). Furthermore, "[a] contractor's past performance record in performing previous U.S. Government procurements is significantly less important that other evaluated factors, including the contractor's proposed technical approach and price/cost combined[.]" Id. at ¶ 2(e).

The Court finds both Ms. Larkin and Mr. Killham credible; however, Ms. Larkin's opinion that a termination would result in irreparable harm is more persuasive. Importantly, while the two experts disagree as to their conclusion about irreparable harm, their testimony was largely consistent regarding federal contracting procedures and disclosure requirements. Both Ms. Larkin and Mr. Killham agree that the federal government considers the past performance of a prime contractor in awarding a contract to a prime contractor. Larkin Rep. at 6-7; Killham Decl. ¶ 22; see also 48 C.F.R. 9.104-1(c); 48 C.F.R. 15.305(2)(i). Ms. Larkin and Mr. Killham also agree that a prime contractor considers the past performance of a subcontractor, among other factors. Larkin Rep. at 3; Killham Decl. ¶ 27(a). Furthermore, the federal government may consider the past performance of a subcontractor in awarding a contract to a prime contractor, among other factors. Larkin Rep. 8; Killham Decl. ¶ 29.

According to Ms. Larkin's testimony at oral argument, federal agencies will frequently construe the word "offeror" in a contract bid solicitation to include the prime contractor and its team of subcontractors, and will therefore examine the past performance of all of the parties. Furthermore, given the highly specialized nature of the contracts at hand in this case, the agency is likely to already know of a default by a subcontractor and would not be able to ignore it in the bid process. Ms. Larkin explains:

18 – OPINION & ORDER

> In evaluating past performance, federal agencies evaluate multiple sources of information, so it is not reasonable to assume that Erickson's termination of Starlite's contract would go unnoticed in any contract competition where Starlite either competes directly for a government contract or indirectly as a subcontractor. Agencies often require each offeror to provide past performance for themselves as well as their subcontractors as a way to gauge the risk that a contractor might fail to successfully perform the contract. See, e.g., Dismas Charities, B-298390, 2006 CPD ¶ 131 (Comp. Gen. Aug. 21, 2006) (noting that the solicitation required offerors to submit "the 5 most relevant contracts and/or subcontracts that were, or are currently being, performed in the past 3 years").

Larkin Rep. 9.

Ms. Larkin testified at oral argument that, while a prime contractor may have an opportunity to explain the cause of the termination to the agency soliciting bids, the subcontractor is not afforded the same opportunity under the Federal Acquisition Regulations. Therefore, a termination would constitute a "black mark" on the subcontractor that it would be powerless to justify. And a prime contractor would not want to hire a subcontractor that could pose a risk to the prime contractor's ability to be awarded a contract by the government.

Ms. Larkin also explained the process by which contractors can protest bids awarded by the federal government. A prior termination for default could be used to protest the award of a government contract to Plaintiff. Larkin Rep.at 10. The possibility of having to engage in the protest process provides an incentive for the government not to consider contractors with adverse past performance.

At oral argument, Mr. Killham made clear that he expressed no opinion as to whether Plaintiff would still be able to win government contracts if Defendants terminated the Agreement for the reasons alleged in this case. In contrast, Ms. Larkin testified that it was very unlikely that Plaintiff would be selected by a prime contractor on a government contract and not face a protest action from other contractors due to the award. Furthermore, Ms. Larkin's expert report states

that a termination would "likely foreclose the possibility of a prime contractor teaming with Starlite to compete for an award." Larkin Rep. at 13.

In a Ninth Circuit case, <u>Amylin Pharmaceuticals, Inc. v. Eli Lilly & Co.</u>, 456 F. App'x. 676, 678 (9th Cir. 2011) the plaintiff's claims that it would lose goodwill were speculative. The plaintiff's claims were supported primarily by the declarations of its own President, Vice President, and Senior Marketing Director, and the plaintiff lacked any "concrete evidence" that the harm to the plaintiff's reputation would occur. <u>Id.</u> at 679.

This Court similarly found that a plaintiff was unable to demonstrate irreparable harm when the plaintiff asserted, without any evidentiary support, that the defendant's actions would harm the plaintiff's reputation and encourage other actual and potential licensees to "delay license agreements, withhold payments, or refuse licenses altogether when they learn that the patents are being challenged." <u>KEE Action Sports, LLC v. Shyang Huei Indus. Co.</u>, No. 3:14-CV-00071-HZ, 2014 WL 5780812, at *4 (D. Or. Nov. 5, 2014).

The present case is wholly unlike <u>Amylin Pharmaceuticals</u> or <u>KEE Action Sports</u>. Plaintiff has submitted ample evidence in the form of a report and testimony of expert witness Ms. Larkin; declarations from Mr. Thomas, Ms. Ford, Mr. Foley (who also testified at oral argument), and Mr. O'Neill; descriptions and charts of pending and future contract bids; and multiple cases showing the impact of past performance on a contractor's or subcontractor's ability to win future bids from the federal government. Plaintiff demonstrated that past performance, including a termination for default, can be a determining factor in a subcontractor or contractor's ability to win contracts and that the likelihood of irreparable harm is imminent for

Plaintiff. In sum, the Court finds that Plaintiff met its burden of showing that it would be likely to suffer irreparable harm in the absence of preliminary relief.[6]

## IV.    Balance of the Equities

In considering a motion for a preliminary injunction, "a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Prod. Co. v. Vill. of Gambell, AK, 480 U.S. 531, 542 (1987); see also Univ. of Hawai'i Prof'l Assembly v. Cayetano, 183 F.3d 1096, 1108 (9th Cir. 1999)("To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of harm caused by not issuing it.").

Defendants argue that Erickson has already incurred substantial costs in preparing to "self-perform" the Agreement. Defendants submit the declaration of Chris Schuldt, Defendants' Director of Programs for the Government Aviation Business Unit. Mr. Schuldt describes how Defendants have relocated helicopters to Afghanistan to replace Plaintiff's helicopters, adjusted staff schedules, hired new personnel, and trained new staff. Schuldt Decl. ¶ 6. Mr. Schuldt states that if Erickson cannot replace Plaintiff as planned, it will lose approximately $1,491,083 that was spent in preparation and will have to layoff 24 people. Schuldt Decl. ¶ 6E.

The Court is unpersuaded by Defendants' arguments. There is no evidence that Defendants would lose the contract with Fluor by continuing to use Plaintiff. The fact that

---

[6] Plaintiff also argued that it would suffer irreparable harm because it is in the midst of a private equity offering and in the process of purchasing new aircraft. Plaintiff contends that the equity offering and aircraft purchase are dependent upon financing arrangements that would be detrimentally impacted by the termination of the Agreement. Foley Decl. ¶¶ 4-9. The Court does not consider these facts in its determination of the irreparable harm factor because, to the extent Plaintiff would suffer an injury as to those events, it would be quantifiable and could be remedied through compensatory damages. Economic damages are not traditionally considered irreparable because the injury *can later be remedied by a damage award*." See California Pharmacists Association v. Maxwell–Jolly, 563 F.3d 847, 851–52 (9th Cir. 2009) (emphasis in original).

Defendants preemptively spent money, knowing of the risk given Plaintiff's motion for a preliminary injunction, does not tip the scale in its favor. See Serco Inc., 81 Fed. Cl at 502 ("the delay and administrative burdens" were "problems of defendant's own making" and were not properly considered in balancing the hardship to the parties).

Furthermore, as discussed above, Plaintiff has submitted substantial evidence that Defendants have hindered Plaintiff's ability to perform under the Agreement and Plaintiff establishes a significant likelihood of irreparable harm. The Court concludes that the balance of equities tips in favor of an injunction.

**V.    Public Interest**

Generally speaking, the public has an interest in "preserving the integrity of the competitive process" in federal government contract bidding. Cherokee Nation Technologies, LLC v. United States, 116 Fed. Cl. 636, 641 (2014).

Plaintiff argues that it would contravene public interest to allow EHI to benefit from its bad-faith behavior towards Plaintiff. Defendants respond that the public interest is heightened when the parties' work implicates military interests overseas. In addition, Defendants argue that because the main contractor, Fluor, has approved the self-performance of helicopter services by Erickson, this Court should be reluctant to second-guess the decisions of parties serving United States government in Afghanistan.

At its core, this case is a contract dispute between two private companies. The Court finds that this factor does not decidedly tip in favor of either party. However, to the extent Defendants have engaged in bad-faith behavior, the Court finds the balance of the equities tips towards Plaintiff.

**CONCLUSION**

It is hereby ORDERED that:

1.      Defendants, and each of them, together with their respective officers, agents, servants, employees and attorneys and all those in active concert or participation with defendants are HEREBY RESTRAINED AND ENJOINED, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, from: Terminating the parties' Aircraft Services Agreement dated July 18, 2011 (the "Agreement") and from taking any further steps to implement such termination, including but not limited to soliciting the employment of Starlite's maintenance engineers and notifying pilots, flight managers and maintenance engineers assigned to Starlite's aircraft that the Agreement and their tours of duty are coming to an end.

2.      This Preliminary Injunction shall remain in effect until the entry of a final judgment in this case.


///


///


///


///


///


23 – OPINION & ORDER

3.       The above Preliminary Injunction is effective immediately. An undertaking is not necessary under the circumstances of this dispute, in which defendants are in possession of substantial funds, in the millions of dollars, owed to Starlite under the agreement until Starlite's invoices are submitted and paid. The monies Defendants owe to Plaintiff on a rolling basis are adequate security in the event Defendants shall be found to have been wrongfully enjoined or restrained, provided that Defendants shall not, without further order of the Court, withhold payment of any such invoices that Defendant would otherwise make in the ordinary course of business. However, the Court will require that Starlite shall file an undertaking in the sum of $10,000.00 within three (3) days after issuance of this Preliminary Injunction.

IT IS SO ORDERED.

Dated this ___15___ day of _____May_____, 2015.


_____
MARCO A. HERNÁNDEZ
United States District Judge